JOSEPH A. THIBAULT v. HERBERT A. SESSIONS AND W. ARTHUR PHIPPS.

|      |      |
|------|------|
| 101  | 279  |
| 107  | 72   |
| 101  | 279  |
| 142  | ³644 |
| 101  | 279  |
| f148 | ⁴672 |

*Libel and slander—Pleading— Privilege—Evidence—Malice—Jury as judges of the law—Damages.*

1. An article which, to the common understanding, charges that the principal of a school has been guilty of taking indecent and criminal liberties with the persons of his pupils, and that the plaintiff, who sues the publishers of the newspaper in which the article was published for libel, has assisted the teacher in so doing, is actionable *per se;* citing *Bourreseau v. Journal Co.*, 63 Mich. 425; *Randall v. Evening News Ass'n,* 79 Id. 278; *Belknap v. Ball*, 83 Id. 591.

2. The defendants gave notice that they would give in evidence in their defense that they had learned that the teachers in said school were in the habit of sending to saloons for liquors to be taken to the school, to the knowledge of the plaintiff; that defendants had been credibly informed of the grossly immoral conduct of the plaintiff as such teacher, and of his habit of having intoxicating liquors in the school, and of his immoral conduct in other respects while engaged as such teacher; that a co-teacher, who was referred to in said article, had prosecuted defendants for criminal libel, and they had been acquitted; and that, believing the facts alleged against plaintiff to be true, defendants published the article complained of as a matter of great public interest and concern, and therefore should insist that it was privileged. And it is held that the facts set forth in the notice, if true, do not support the charge published, and the court was justified in striking the notice from the files.

3. An objection to the introduction in evidence of a subsequent article published by the defendants, containing a letter from the plaintiff demanding a retraction, which was refused, was properly overruled.

4. Evidence that the plaintiff had liquor in the school, and gave it to the pupils, unless supplemented by proof connecting such facts with the acts charged against him in the article complained of, was properly excluded.

5. The constitutional provision (article 6, § 25) that, in all prosecutions for libel, the jury shall have the right to determine the

law and the fact, does not deprive the trial judge of the power to rule upon the introduction of evidence in libel cases, either civil or criminal.

6. In an action for libel only the general reputation of the plaintiff can be shown in mitigation of damages.

Error to Houghton. (Haire, J., presiding.) Submitted on briefs June 7, 1894. Decided June 26, 1894.

Case for libel. Defendants bring error. Affirmed. The facts are stated in the opinion.

*W. F. Riggs (Alfred A. Sessions, of counsel), for appellants.*

*Chadbourne & Rees,* for plaintiff.

HOOKER, J.   The defendants appeal from a judgment in an action of libel, brought against them by the plaintiff, who was a teacher in a parochial school at Lake Linden, in the county of Houghton.   The alleged libel consisted of an article published in defendants' newspaper, a copy of which is set forth in the declaration, which reads as follows:

"STATE OF MICHIGAN.
        "In the Circuit Court for the County of Houghton.
                                "*County of Houghton*—ss.:
"Joseph A. Thibault, the plaintiff in this suit, complains of Herbert A. Sessions and W. Arthur Phipps, the defendants herein, they having been duly summoned to answer the plaintiff herein, of a plea of trespass on the case.

"For that whereas, the said plaintiff, before and on the 18th day of February, 1893, was a person of good name, credit, and reputation, and deservedly enjoyed the esteem and good opinion of many persons; and that previous to the said date, namely, from about the month of September, 1890, to the month of June, 1892, was one of the teachers in the parochial school at the village of Lake Linden, in said county of Houghton, and has since then been engaged at the city of Chicago, in the state of Illinois, in the study and practice of dental surgery and dentistry; and that during all of said time was of good name, credit, and reputation, and

deservedly enjoyed the esteem and good opinion of many persons as such teacher as aforesaid and in his last profession.

"Yet the said defendants, well knowing the premises, but contriving and maliciously intending to injure the plaintiff, and bring him into public scandal and disgrace, heretofore, to wit, on the 18th day of February, 1893, at the county aforesaid, falsely and maliciously did compose and publish, and cause to be composed and published, of and concerning him, the said plaintiff, a certain false, scandalous, and malicious libel, containing the false, scandalous, and malicious matters following of and concerning the said plaintiff, that is to say:

"'Devils. [Meaning thereby said plaintiff and others.]

"'Hanging is Too Good for Them. [Meaning thereby said plaintiff and others.] Worse than Brutes. [Meaning thereby said plaintiff and others.] Gignac run out of Lake Linden.

"'Two Lake Linden School Teachers Guilty of Horrible Crimes. [Meaning by said two Lake Linden school teachers the said plaintiff and others.] Over Thirty Children Outraged. Proofs and Particulars.

"'From several Lake Linden parties came to the Conglomerate the pitiful cry, "Come down and help us." And none of the wicked cities of history could recite a more revolting story of crime and bestiality. A Conglomerate reporter set to work on the case, and, besides confirming many rumors and obtaining absolute proof of them, unearthed facts still more revolting that had not been even whispered among those most deeply concerned. But a small part of the terrible story, because of its horrible filth, can. be repeated in these columns, but proofs so certain and sure of the most damnable crimes are held in this office that, were they known by the general public, the perpetrators would not now be alive.

"'August Joyal was interviewed by a Conglomerate reporter. He stated that his boy and others that he knew of were implicated, —sons of M. Marchand, M. Amie Lanctot, Mr. Golden, M. N. Gregory. Messrs. Marchand and Golden, finding their boys very sick, questioned them closely as to the cause of it. At first they would tell nothing, and after severe threats they told how they had been used by Gignac, the head teacher. He had been guilty of the most atrocious proceedings against their persons. Last Sunday evening he first found about his own boy by information given by Messrs. Marchand and Golden. He couldn't face his own boy to ask him the questions, but, cautioning him to tell nothing but the truth, he trusted the task of questioning the boy to a friend. The boy confessed that he, too, had been treated in the same manner. He added, too, that his son's health and constitution was ruined. On getting his son's confession, Mr. Joyal and his friend, after demands, found that Mr. Gregory's boy had been treated the same way. A committee of· five waited on Fr. Mesnard, who was utterly prostrated by their statements.

"'The committee sent Gignac a letter, which did not reach him. Receiving no response, Mr. Joyal called on Gignac, and stated his business. The brute turned white at the statement. Joyal told him of the confession of the boys, and the worst of the story, and then asked: "Are you guilty or not guilty?" Gignac responded, "I am not guilty," and abjectly added, "But the boys

are all against me. What can I do?" Joyal said: "If you are an innocent man you will stay here, and I'll help you fight it. If you are guilty, we'll have justice, and hang you like a dog." Gignac showed such conclusive signs of guilt that Joyal ordered him to leave the town immediately on peril of his life. The following morning the committee found that Gignac had not gone, and at half past four they again waited on Fr. Mesnard. They asked the reverend gentleman why Gignac had not gone, and insisted that he must go, or they would serve him as they did McDermott. It will be remembered that McDermott was driven, naked, in the dead of winter, from Lake Linden to Dollar Bay, and lashed with heavy whips. His crime was inhumanly torturing his wife on her death-bed by pouring alcohol on her, setting fire to it, biting great pieces of flesh from her body with steel pincers, and showing other such proof of conjugal affection. It is needless to add that Gignac stood not on the order of his going, but took the five o'clock train for parts unknown.

"'The Conglomerate reporter unearthed proofs that over 25 other cases, both girls and boys, have been so used by these teachers [meaning thereby the said plaintiff and others], striking some of the most respectable families of Lake Linden. These children range in age from 8 to 13 years. This work has been going on for 4 years, according to the information received by the Conglomerate. Gignac has been ably assisted in his horrible work. Two devils, Vandestine, Thibeau [meaning by the said Thibeau, the said plaintiff]. The latter [meaning the said plaintiff] is now in Canada. In addition to these atrocities, Gignac has even advised the children that it was no harm to commit incest, and in two cases his hellish advice has been acted upon by children under ten years of age. Van—— seems to have paid more especial attention to the girls, and not only the little girls from 8 to 13 came under his baneful influence, but older daughters of respectable families have been his toys. He was ordered to leave last night.'

"In consequence of the committing of which said acts by the said defendants, the said plaintiff has been and is damaged and injured in his good name, credit, and reputation, and in his good name, credit, and reputation as a teacher as aforesaid, and in his said profession of dental surgery and dentistry, and has been and is brought into public scandal and disgrace, and has been and is shunned and avoided by many persons, and has been and is damaged and injured in his said business and profession, and has been and is otherwise greatly damaged and injured, to the damage of the said plaintiff $10,000; and therefore he brings suit, etc."

Counsel for the defendants contend that the declaration states no cause of action, in that it does not allege what specific crime is imputed to the plaintiff. The caption of this article, set up in the declaration, says: "Two Lake Linden School Teachers Guilty of Horrible Crimes." The pleader adds by way of innuendo: "Meaning by said two Lake Linden school teachers the said plaintiff and others."

Passing several sentences, which in a greater or less degree imply that indecent liberties had been taken at the school with the persons of pupils, we come to the following:

" Messrs. Marchand and Golden, finding their boys very sick, questioned them closely as to the cause of it. At first they would tell nothing, and after severe threats they told how they had been used by Gignac, the head teacher. He had been guilty of the most atrocious proceedings against their persons. Last Sunday evening he first found about his own boy by information given by Messrs. Marchand and Golden. He couldn't face his own boy to ask him the questions, but, cautioning him to tell nothing but the truth, he trusted the task of questioning the boy to a friend. The boy confessed that he, too, had been treated in the same manner. He added, too, that his son's health and constitution was ruined. On getting his son's confession, Mr. Joyal and his friend, after demands, found that Mr. Gregory's boy had been treated the same way. A committee of five waited on Fr. Mesnard, who was utterly prostrated by their statements."

And again:

" The Conglomerate reporter unearthed proofs that over 25 other cases, both girls and boys, have been so used by these teachers [meaning thereby the said plaintiff and others], striking some of the most respectable families of Lake Linden. These children range in age from 8 to 13 years. This work has been going on for 4 years, according to the information received by the Conglomerate. Gignac has been ably assisted in his horrible work. Two devils, Vandestine, Thibeau [meaning by the said Thibeau, the said plaintiff]. The latter [meaning the said plaintiff] is now in Canada."

The common understanding of this language would be that the principal, Gignac, had been guilty of indecent and criminal liberties and practices with the persons of his pupils, and that the plaintiff had assisted him therein, which language is clearly actionable *per se*. *Bourreseau v. Journal Co.*, 63 Mich. 425; *Belknap v. Ball*, 83 Id. 591; *Randall v. Evening News Ass'n*, 79 Id. 278.

The defendants pleaded the general issue, accompanied by the following notice:

"*To the Above-Named Plaintiff*:

"Please take notice that on the trial of the above cause the defendants will give in evidence in their defense under the general issue above pleaded:

"1. That the Calumet Conglomerate is a public newspaper printed and published in said county.

"2. That before the publication of the article complained of, and in the months of January and February, 1893, the statements and charges therein contained were rumored in and about Lake Linden, in said county, and came to the knowledge of these defendants; that neither the public authorities nor the authorities of the said school had taken any action to learn of the truth or falsity of the said charges, although the people of the State of Michigan, and more especially the people of Houghton county, were largely interested in the good name, fame, and credit of the said school, and in the pupils attending said school; that these defendants, in a proper way and manner, caused an investigation of such rumors, and from such investigation learned that gross immorality, wickedness, and crime were prevalent in the said school, and had extensively prevailed therein for a long space of time; that these defendants learned that all the teachers roomed in the said school, and had regularly lodged therein during the period of time they were engaged therein as teachers, and that this practice had existed ever since the existence of said school; that spirituous and intoxicating liquors were constantly kept and used in the said school by teachers and scholars; that teachers in the said school were in the habit of sending to saloons for liquors to be taken to the said school, to the knowledge of plaintiff and the other teachers therein; that teachers and pupils, at various times and on various occasions, were drunk together in said school; that these drunken debauches took place in the day-time as well as in the night-time; that the detestable crime of sodomy was practiced by the principal upon the pupils attending said school; that these defendants, well knowing the premises and the injury such reports would have upon the said school, and the actual injury being done, and believing the attention of the people should be called to the matter, published the alleged libelous article as a matter of great public interest and concern; and therefore insist that the article was privileged.

"3. That these defendants were credibly informed of the grossly immoral conduct of this plaintiff as a teacher in said school, and of his habit in having intoxicating liquors in said school, and of

his immoral conduct in other respects while engaged as such teacher, and the foregoing facts existing in said school, and, believing the said facts to be true, published the alleged libelous article as a matter of great public interest and concern, and therefore insist that the article was privileged.

"4. That Edward Vandestine, one of the said teachers in said school, referred to in the alleged libelous article, and being a co-teacher with plaintiff in said school, commenced and prosecuted these defendants in an action of criminal libel for the publication of said alleged libelous article, which last-mentioned action was tried before a jury in justice's court before M. Finn, Esq., one of the justices of the peace in and for said county, and these defendants were acquitted.

"5. That the statements in the alleged libelous article were true."

After the opening of the case, and upon motion of the counsel for plaintiff, the notice was stricken from the files, except the fifth section. Defendants' counsel allege error upon this ruling, claiming that such notice set forth a qualified privilege on the part of defendants, making it incumbent upon the plaintiff to prove both falsity and malice. We do not discover in the notice any statement of fact that connected the plaintiff with the affair, except the following, viz.:

"That teachers in the said school were in the habit of sending to saloons for liquors to be taken to the said school, to the knowledge of plaintiff and the other teachers therein; * * * that these defendants were credibly informed of the grossly immoral conduct of this plaintiff as a teacher in said school, and of his habit in having intoxicating liquors in said school, and of his immoral conduct in other respects while engaged as such teacher, and the foregoing facts existing in said school, and, believing the said facts to be true, published the alleged libelous article as a matter of great public interest and concern, and therefore insist that the article was privileged."

In addition to the above it was alleged that Edward Vandestine, one of the teachers referred to, and a co-teacher with plaintiff, had prosecuted defendants for libel, and that they had been acquitted.

The defendants, then, upon information that plaintiff knew that other teachers were in the habit of sending for liquors to be taken to the school, and that he was guilty of grossly immoral conduct in the school (whatever that may mean), and of his habit of having intoxicating liquors in said school, and of his immoral conduct in other respects while engaged as such teacher, took the liberty of charging that he was guilty of indecent practices with his pupils. We think the circuit judge was right in holding that these things, if true, did not support the charge that was published, and he was therefore justified in striking the notice from the files. They constituted no defense to the action. Before there is any occasion to discuss the question of privilege, something must appear upon the record to raise such privilege.

Objection was made to the introduction of three articles published by defendants after the publication counted upon. They were offered as tending to show malice. The first contained a letter from the plaintiff, demanding a retraction, which was refused. This was clearly admissible. The others, if read in the light of this and the article sued upon, might have that tendency. Counsel say that the effect was to injure the defendants by getting their attacks upon Gignac and Vandestine before the jury. One of them reported an acquittal of defendants upon a charge of criminal libel growing out of the affair, while the other apparently ascribed persecution as the motive actuating the plaintiff in pushing this action to a trial after the disclosures made upon the trial of the criminal case. We cannot say that it was error to admit them.

Upon cross-examination the plaintiff was asked concerning his intimacy with Gignac and Vandestine, and his knowledge concerning the use of liquors in the school, and his own connection therewith, and his knowledge that the boys and girls of the school went to Gignac's room in

the night. These questions were said to be asked to show the character of the plaintiff. The court permitted a searching examination upon his conduct and knowledge concerning what took place at the school, and defendants have no room for complaint that his character was not placed before the jury, so far as it could be ascertained by cross-examination.

Counsel complain that they were not permitted to show that the plaintiff had liquor in the school. The court repeatedly said that, if there was an expectation of connecting such liquor with the acts referred to in the article complained of, the evidence would be received; but counsel seem to have been contending that the giving of liquor to the children would have led up to or facilitated the acts of Gignac, and that would justify the statement that plaintiff assisted him in the commission of the acts alleged. The jury should not have been permitted to find that the plaintiff aided and abetted from that fact alone. Counsel were persistent in the effort to prove that plaintiff had liquor. The following colloquy shows that the court was disposed to admit the proof if it could be made material:

"*Mr. Riggs:* That is very true. Ordinarily it would not, but, if there was drugged liquor there in the school, and it was used, and this witness knows of it, and, from the effect of the use of it, it became so notorious as we expect to show it, I think we have a right to put it in.

"*The Court:* Now, you always stop right there. If you stop there, it hasn't anything to do with the case. It seems that is the extent of the testimony. I have kept ruling on that right along all day long, and I am going to continue on ruling that way until I am convinced that I am wrong. The fact that drugged liquor was there, unless you can show that this man gave it to those children, and, in addition to that, aided these other men in committing this crime, I don't see how you can show that even that is material in the case. If, in a debauch, this man administered the liquor, and aided these other men in committing the crime, knowing it himself, being near

where it was done, and knew all about it, then I presume you could charge that he assisted; but the mere fact of having liquor in the house, even if he gave it to the children, would have no tendency to show that he committed this crime, or assisted others in doing it.

" *Q.* Did Thibault ever give you any of that liquor? (Objected to as immaterial. Objection sustained.)

" *Q.* Did Mr. Thibault ever give you any drugged liquor? (Objected to as immaterial. Objection sustained.)

" *Q.* Do you know of your own knowledge of the horrible crime of sodomy being committed in that building? (Objected to as immaterial.)

" *The Court:* By whom,—by Thibault? If you put that on, I will allow the question; otherwise I will sustain the objection.

" *Mr. Riggs:* Exception.

" *Q.* I understand you that you had some of that drugged liquor. Now, may it please the court, I wish to show by this witness that he was put in that condition, and in that condition that crime was committed upon him.

" *The Court:* By Thibault? If it was, you can show it.

" *Mr. Riggs:* I am not certain just now.

" *The Court:* Ask him the question if Mr. Thibault ever committed this crime. I will allow you to ask the direct question.

" *Q.* Was that crime ever committed on you there by reason of your having liquor and being made drunk? (Objected to.)

" *The Court:* That is not the question.

" *Q.* Was that crime committed there upon you, in the school building there? (Objected to.)

" *The Court:* By Thibault? If you put that in, it is material in this case. If it was somebody else, it has nothing to do with this case.

" *Mr. Riggs:* If I can show by this witness that he was intoxicated by the one teacher—

" *The Court:* And then somebody else got him in that condition and committed this crime,— would that be material to show that this man committed this crime?

" *Mr. Riggs:* Yes, sir.

" *The Court:* If you can show that he got him intoxicated for the purpose of having this other man do that, that may be material, but we cannot be allowed to guess at it.

" *Mr. Riggs:* This is a question for the jury, I should

say. Well, I shall have to ask the privilege of making an offer of evidence."

Counsel assert that under article 6, § 25, of the Constitution, the jurors were the judges of the law, as well as of the fact, and the judge so charged the jury. An exhaustive discussion of this subject will be found in Cooley, Const. Lim. (6th ed.) p. 566 *et seq.*, where the cases are collected. While some cases in England, followed by the case of *Shattuck v. Allen*, 4 Gray, 540, indicate that the doctrine extends to civil cases in England and Massachusetts, the current of American authority is to the contrary. These are discussed in an interesting opinion by Mr. Justice Sharswood in the case of *Pittock v. O'Niell*, 63 Penn. St. 253, where a similar provision was held to apply to criminal prosecutions only. The language of our Constitution (article 6, § 25) is broader than that of Pennsylvania, in that it covers "all prosecutions" for libel, instead of "all indictments." Apparently it was taken from the constitution of New York, where the same provision is found, and this was construed in the case of *Hunt v. Bennett*, 19 N. Y. 173, and other cases cited with approval by Mr. Justice Sharswood. *Snyder v. Andrews*, 6 Barb. 43; *Green v. Telfair*, 20 Id. 11. Although *Hunt v. Bennett* was decided after the adoption of our Constitution, and it cannot, therefore, be said that we adopted the construction approved in that case with the constitutional provision, we think it sound in principle. But counsel invoke this provision to aid in reversing the case, because the court assumed to exclude certain evidence offered on behalf of the defendants. We pass the subject with the remark that, whatever may be the true rule as to the authority of a jury to determine whether alleged defamatory writings come within the definition of libel in civil cases, no authority is cited to sustain the proposition that this

101 MICH.—19.

constitutional provision deprives the trial judge of the power to rule upon the introduction of evidence in libel cases, either civil or criminal.

After the various rulings had been made, counsel for defendants made the following statement:

"*Mr. Riggs:* I offer this whole line of evidence, and offer to repeat it, on the question of damages. I offer to show the conduct of this teacher as a school teacher on the question of damages.

"*The Court:* His general reputation you may show."

Notwithstanding this ruling, counsel proceeded to repeat his effort to get before the jury the various circumstances explicitly ruled out before, to the exclusion of which he excepted. The court was correct in his ruling; general reputation only could be shown. *Bathrick v. Post & Tribune Co.,* 50 Mich. 630; *Farrand v. Aldrich,* 85 Id. 600; *Lamos v. Snell,* 6 N. H. 413; *Sawyer v. Eifert,* 2 Nott & McC. 511; *Randall v. Holsenbake,* 3 Hill (S. C.), 175, 177; *Fisher v. Patterson,* 14 Ohio, 418, 425; *Ridley v. Perry,* 16 Me. 21; *Bowen v. Hall,* 20 Vt. 232; *Thompson v. Nye,* 71 E. C. L. 181, and note; *Smith v. Buckecker,* 4 Rawle, 295; *Long v. Brougher,* 5 Watts, 439; *Steinman v. McWilliams,* 6 Penn. St. 170; *Jones v. Stevens,* 11 Price, 235; *Parke v. Blackiston,* 3 Har. (Del.) 373.

We have examined the other errors alleged, and think that it is unnecessary to discuss them further than to say that we find nothing in them calling for a reversal of the cause.

Judgment affirmed.

The other Justices concurred.